Our next case is Agility Public Warehousing Co. v. United States Mr. Schaffer, you can reserve five minutes for rebuttal, correct? Thank you, Your Honor. Yes, please. Okay. Looks like we're ready to go. Good morning, Your Honors. May it please the Court. Derek Schaffer here on behalf of Agility. Your Honors, the lower court adopted the unprecedented and anomalous position that the government's mere claim of an offset under the Debt Collection Act suffice to supersede the government's acknowledged contractual obligations, even though the government otherwise lacked underlying basis in law for the offset. The upshot of the decision below is that a bureaucrat's say-so combines with the Debt Collection Act to justify an offset by the United States that is otherwise illegal. That view of the contracting officer's offset determination as self-justifying is unlawful, it is unfair, and we respectfully submit untenable, and we ask this Court to reverse it. I'd note, Your Honors, that there is no precedent whatsoever for the trial court's interpretation of the Debt Collection Act, and Judge Wheeler-Below didn't claim to have any precedent for it. The American Airlines case that we cite that came up from the D.C. District Court to this Court is directly to the contrary as precedent, because there the District Court had determined that a claimed offset under the Debt Collection Act was contrary to the substantive law, and therefore it was unjustified. And what was up on appeal to this Court was only the question as to whether the District Court was wrong as to one tiny subset of the amounts of issue and whether there was a regulatory or contractual basis for that portion of the offset. Do you rely on cases other than American Airlines for the proposition that there has to be some underlying legal basis for the debt? Well, Judge Stuhl, we think that that is, the bedrock of that is really that the United States is held to the rule of law, is held to its contractual obligation. That has flowed throughout this Court's jurisprudence and the U.S. Supreme Court's jurisprudence. So I think as to the principle, there's that larger body of precedent. Specifically as to the Debt Collection Act, I think the American Airlines case is directly on point. There are other cases we have found where the analysis was made under the Debt Collection Act and it was all about the substantive law, Judge Stuhl. It wasn't just, well, the government checked the boxes and therefore it can claim this offset under the Debt Collection Act. It always goes to the substantive law and answers the dispute and resolves the dispute that way. What about the Cecile case? I mean, it doesn't directly answer the question, but in the Cecile case, this Court held that the DCA was separate to the common law right of a contractual offset. And so how does that play into this? I've always understood, Judge Stuhl, that there is some other basis, including in that case, outside of external to the Debt Collection Act. Yes, the United States may have special rights. It may, if it overpays a welfare beneficiary, if it makes some mistake that is a governmental mistake and is demonstrated to the court as a mistake so that there was an erroneous payment, then the government can, under whatever that body of law is, exercise its rights under the Debt Collection Act. What to us is so anomalous and problematic about the decision below is that the Court of Federal Claims looked at the United States government's premise for the offset, that there had been some overpayment under the PCO contract and confirmed that was spurious, that was wrong, that was contrary to the law of contract, and that was contrary to the common law, and there was no basis for this other than the fact that a bureaucrat who administers a contract determined that, yes, I'm going to assert an offset. What is the status of your, I think you've got a district court case filed in the D.C. District Court? Correct, Your Honor. And that's filed under the APA. What exactly is the challenge there, and what is the status of that case? It's a challenge of the Administrative Procedures Act to, among other things, the claimed offset and to the claimed offset or the claim under the PCO contract and the implications that has the monies owed to agility undisputedly under the DDKS contract. That case has stayed. So you're challenging the agency or what you refer to as the bureaucrat's determination that there is a debt. You're challenging that in that case, right? Absolutely, and I'll be candid about our end goal, which is to get them. You're not challenging it here. You're challenging the substance of that. Well, we thought that the straightforward path, Judge Dole, was to basically say we're owed money under the DDKS contract in an amount certain, $17.7 million and counting. That is a claim for money damages from the United States in connection with the contract. We thought that fundamentally that case belongs in the Court of Federal Claims coming up to this court. This court has been emphatic about that. The correctness of that jurisdictional path, and we cite these cases in pages 4 and 7 and 8 of our reply, Christopher Village Suburban Mortgages Association, and my concern, Judge Dole, consistent with the way the government has conducted this litigation thus far, is if we're sent back to the D.C. District Court to pursue our APA claim there, the argument will come from the United States that it is jurisdictionally foreclosed because at bottom that is a claim for money damages. Again, citing the precedents that I was just citing where we've seen the government make those sort of arguments. I think they will also point to Judge Wheeler's decision and claim that it has race judicata effect, as perverse as that is. And they'll also say what they said candidly to Judge Wheeler, which is that the APA suit is illusory because what we can't do, they said, under the Administrative Procedures Act case, is challenge the math. Look behind the government's claim of an overpayment and challenge the premises. Let me just interrupt you. So I think the government's only real argument here is that because U.S. funds were used to pay a debt actually owed by the Iraqi government, that U.S. funds can be withheld from the payment to the United States' obligation on the Kuwaiti contract. Suppose we said that is wrong because Judge Wheeler is right about the absence of a common law offset. And it's also wrong because the DCA requires an obligation that's being offset to come from a source of law outside the DCA. Does that fully resolve this case in the sense of thereby entitling you to recover on the $17 million contract claim? Yes, Judge Toronto, it does, because that money is undisputedly owed under the DDKS contract. It is due to be paid. The only basis for the offset is that the government invoked in connection with the funds paid out under the PCO contract. That's exactly what Judge Wheeler looked at in the first substantive portion of his decision. Because as I understand the government's argument here, it does not assert that there is a basis outside the DCA for the assertion of a debt to the United States under the Iraqi contract. Let me be fair to the United States, Judge Toronto, because I think they do make in their brief, and you'll hear this from Judge Grimaldi, an argument in the alternative that Judge Wheeler was wrong and there's some common law basis for them to recover those monies. But I agree with Your Honor that the premise of that is that there was a quote, unquote, what they call an overpayment. And that overpayment, just as Your Honor is saying, was in connection with the PCO contract. And just to underline this point, these were not monies that just… This is the argument, the common law argument that I took to be essentially relying on certain language taken out of context from the Seventh Circuit case in which there was undisputedly an obligee, obligor relationship and the only question was whether the two different things being offset were sufficiently related. But within the universe of obligor, obligee and both the offset thing and the place to be offset, I assume I reject that. Then I don't see the government has asserted that there is a legal source of the obligation that they want to offset the $80 million or something that runs to the United States. For example, they haven't said agility committed fraud on the United States as administrator or something like that. You would agree that if that were true, there might be something to offset. Well, I agree 100% with everything Your Honor just said. And I would expand upon it by saying it is undisputed on the pleadings. And I think in fairness to Mr. Grimaldi, he's not going to deny Judge Toronto that when these monies were paid by the United States, they were purposefully paid by the United States in response to the invoices that agility was submitting under the PCO contract. Why isn't a claim that there's been an overpayment enough? Because it's incoherent by its term, Judge Reynolds, to say that the United States made an overpayment when they have foreclosed any adjudication of the competing contentious. We believe that agility was underpaid. Agility was underpaid on this contract to the tune of more than $40 million. There's no foreclosure of the application of the DCA. Well, I think that there is, Judge Reynolds, when it's a shared premise per this court's prior holding accepting the United States arguments that they were nothing more than an agent under the PCO contract. They had no liability under the PCO contract. And according to the same restatement third that the court relied upon, they had no entitlements under the PCO contract. And one last point. That goes to the argument that you have to have some form of contractual right in order to proceed under the DCA. But I read the DCA, and all you need is a claim. But I believe that that claim, Your Honor, has to be based on something other than a bureaucrat say-so. To take Judge Toronto's formulation, some law external. There's been an overpayment. The government's out $80 million. But, Judge Reynolds, with all due respect, they've never shown that in any court. And when we tried to have adjudication of competing contentions where we claimed underpayment and the United States claimed overpayment, that was the case as it was postured before the Armed Services Board of Contract Appeals. And the United States said that should never be adjudicated either way because the United States was not a principal to the contract. It was not a party to the contract. And so if there were any disputes about overpayment or underpayment, that's a dispute between agility and Iraq or between the United States and Iraq. But it is a matter of, I think, law and principle and equity that says if the United States has said that they cannot have liability under a contract, they also cannot be collected under the contract. And otherwise, Your Honor, it would give the United States exactly the super contractual rights that Judge Wheeler in footnote 8 of his opinion on page 14 of the appendix. He said, of course, that can't be right. The United States cannot be doing that. No party gets to do that. And it does not fall on the Debt Collection Act that they can. I'm not persuaded. Tell me why claim, the word claim in the DCA does not extend to an overpayment that the government has made. My only submission to Your Honor is that it has to be an overpayment according to some law external to the DCA. And I think it would astonish the United States. Why does it say that? What in the DCA does it say that? We do have courts that have looked at statutory changes to the DCA and recognize that there was no substantive change in law that resulted from those modifications. I think if you look at the natural understanding of a claim or a debt, it is not that it is being conjured into existence by a bureaucrat. It is some preexisting debt or claim that the United States is collecting on. And the last point, Judge Stoll, if I may make it. I just want to ask you, because this is important. Trust me, you're going to want to answer this question. Okay, yes. What about the broad language of Section 3701, which is exactly what I think Judge Rehm is referring to? There's broad language there in Section B1 defining claim or debt means any amount of funds or property that have been determined by an appropriate official of the federal government to be owed to the United States by a person, organization, or entity. A claim includes without limitation. And you go down to Part C and it says overpayments. So there's nothing there referencing common law or nothing. And so how do you respond to that? Okay. To take that, let me start by taking the plain language just as you do, Judge Stoll, just as you do, Judge Rehm. As I understand determined to be owed, that means that there's been a determination that that money is owed. It is not a creation of a debt. It is not a manufactured determination. It assumes that that is something that was determined to be owed and then a court can review for itself to say. Why does it say determined by an appropriate official of the federal government to be owed? Well, I think the appropriate official is the civil servant. It is the bureaucrat. It's someone who's been authorized down the chain to administer contracts. That's how it was done here. And I do not think it would satisfy. Even if you didn't think that that was true from the plain language and preexisting law and the fact that Congress didn't mean to make some earth-shattering change in the law of government contracts and all other law, even if you didn't believe that, Judge Stoll, you would want to presume that the United States Congress acted constitutionally with sensitivity to due process, to rights of judicial review, to rights of a hearing, the ability to be dealt with fairly by the United States. And that constitutional avoidance principle means that you would want to construe the Debt Collection Act the way that we do and the way that every other court that we think has been deciding a dispute like this has approached it. But you have raised the constitutional challenge. We did. We raised constitutional avoidance. And in fairness to Mr. Grimaldi, he does not deny that that reading of the DCA would be unconstitutional. And so, as I understand the United States' position, they want to put all their eggs in the basket of the APA and the D.C. District Court and assure you that, look, a court will look at this. It will do it in, you know, D.C. District Court, going up to the D.C. Circuit, and that's how these important questions will be resolved. But even the United States government. Can I just ask, getting back to the language, the definition of language, is it relevant or sufficient or wrong to say the person whose money you would otherwise pay but for the offset has to actually owe something to the United States? It's not somebody else owing money to the United States. And agility just doesn't owe a dime to the United States under the Iraqi contract. That has to be right. I think that every court that has looked at the Debt Collection Act has done so with the premise that that analysis is correct. I take it that the crucial textual issue would be whether owed to the United States has to mean by this person as opposed to by somebody else. Yeah, and not just because a bureaucrat said so. That can't be the end of the inquiry. I got to tell you, I think that this focus on the bureaucratics, I find that a distraction here. I'm not getting that as helping your argument. I don't mean to distract Judge Toronto, but I think that Judge Wheeler in his analysis below basically said the only thing that a reviewing court is asking is were the procedural boxes checked? Even if, to take your Honor's premises, which I share, even if it's absolutely clear that there was no actual debt or claim owed by agility to the United States. Though there may well be a debt owed by somebody. It may be. In fact, $80 million may be. And that would be Iraq. That would be Iraq, exactly per the premises of this court's prior holding and the arguments that the United States made. And I know I'm running out of time, Your Honor. Let me just say briefly, we also have arguments here about the duty of good faith and fair dealing. And if nothing else, Judge Reyna, even if the government had the statutory right to reach out and withhold these monies under the DDKS contract, under these circumstances, it's denying agility the fair benefit of the bargain it struck under the DDKS contract. So you could, if you wanted to avoid the larger Debt Collection Act question, you could decide the case that way. And we submit that this is a case for judicial estoppel of the United States. Can I ask you another question? I mean, on the procedural protections. There are certain procedures that are supposed to be followed in this case. And I'm just looking, like, why aren't those procedural, setting aside your challenge, that those procedural protections weren't satisfied? Which we would ask for a remand on at the very least. Right. I'm wondering, you know, when you look at, you know, the purpose and the preamble to this DCA, it talks about having to ensure that debtors have all appropriate due process rights, including the ability to verify, challenge, compromise claims, and access to administrative appeals procedures, which are both reasonable and protect the interests of the United States. And the fact that there are procedural protections, why aren't those enough in this circumstance to protect? Because, respectfully, they are rendered meaningless and hollow if the upshot of those procedural protections is when agility goes to court and said, this officer determined that we owed a debt that clearly we did not owe. It was not owed by us. If it was owed by, we don't think it's owed by anyone, according to the available evidence. But even if it was owed by anyone, it's owed by Iraq, and it's between Iraq and the United States. If a court that looks at that and says, absolutely, agility, you're right, but I'm powerless to do anything about it because the determination has been made that there should be an offset. That's the end of your case. If that's where the Debt Collection Act leaves us, it is, in my respectful submission, patently unconstitutional. I don't think that's a plausible reading of what the Congress intended. The U.S. government has never, as far as we can tell, construed the Debt Collection Act that way. No court has ever construed the Debt Collection Act that way. And even here, at this point, Judge Stoll, they are not saying that this would be the end of the case. They're saying, well, and we submit maybe a shell game, but we should go to the D.C. District Court and make our arguments there as to why the determination was substantively wrong. Can I ask one question on this procedural front? Suppose you're right that procedures weren't followed. What benefit do you get out of that? Why can't the government just go now and follow them in a way that you would find in compliance with the law and do the exact same bookkeeping subtraction that it's already done? Two reasons why. The first is, if all we get is procedural protections, Judge Toronto, if that's all we get under the Debt Collection Act, we think that every I should be dotted and every T should be crossed, because that's the bare minimum that the plain terms of the statute entitle us to. So that's a formalistic argument. But the second argument, the more optimistic and substantive argument, is even the United States government can be shamed sometimes. And if we can go through the documents contemporaneously and demonstrate what I think we might have been able to demonstrate, might still be able to demonstrate. So you want to persuade them that you don't actually own the 80? And that they know it. And that they know it. This is all a post hoc rationale prepared for this Court and the Court of Federal Claims. Okay. Let's hear from the other side now. Good morning. May I please the Court? Your Honors, please. Just a quick question before you go on. The money that Agility received that's in question here, who paid that money? The Iraqi taxpayer or the U.S. taxpayer? For these task orders that are in question, the United States taxpayer. This was money that, if we follow the appropriations trail, was appropriated for the reconstruction of Iraq and given to the Department of Defense for that purpose. As far as we can tell, because frankly it's very difficult to read the appropriations lines in the Joint Appendix. It's all numbers and letters all combined together. But we've been able to trace it to a certain point to understand that the United States Army Corps of Engineers paid the money. It was their appropriated funds. And the contracting officer, who was an American, paid the money to Agility. On behalf of Iraq? For the contract, yes, for the Iraqi contract. So your government can give money to a foreign government, which then enters into a contract. And the fact that it's U.S. funds, why should that be disposed of? For example, take this situation. My neighbor needs a new roof. And the neighbor goes out and gets a roofer, enters into a contract. The neighbor tells me, I'm a little short on cash, can you help out? So I say, sure, I'll pay. I'll actually fund this for you. And I decide, geez, my roof needs replacement, too. So I enter into a separate contract with the roofer. Before I pay the roofer on my house, I learn from my neighbor that I think I overpaid to the roofer. There's a problem with the roofer. Can I actually subtract that amount from the amount I owe on my roof? Well, you can certainly try to, Your Honor, yes. Is there any case in history that has allowed that kind of offset situation? There's two things about that. I don't pay the roofer for the only contract I have with the roofer because I used my money to help my neighbor pay his contract. I understand, Your Honor. I want to understand, yes. That is the situation. The scenario that we have here is a very complicated one. That is this situation, right? No, it's not. Why? Because in this situation, what we had was an appropriations fund by Congress for a certain purpose, the reconstruction of Iraq. It wasn't a gift to Iraq. I think the situation you're describing, you're giving your— I'm sorry. Here's my problem. You did not assert anywhere in your brief, as far as I can tell, here is why there is a legal obligation running between Agility and me based on appropriations or anything else. You said the fact that it is U.S. money is the only thing we're relying on. Correct. That's my roofer example, and I do not understand how that could be a basis for an offset. Well, it's the text of the DCA, Your Honor, the plain text of the DCA. Okay. Correct. But do you have any case outside the DCA, and then we'll get to the DCA, where my hypothetical would allow that simply because I used my cash to help another contractor? Well, I would say that U.S. v. Wirtz, the traditional common law collections case, just says in it that if the United States overpays somebody by mistake, that is something that can be collected. On an obligation generated from programs? Correct, correct. That is what offsets are. They're on a different obligation. I'm sorry, but you have not identified any obligation running between the United States and Agility except on the Kuwaiti contract, which is what you want to not pay. That is correct, Your Honor, yes. We are based on our argument here. Okay, I'm going to take it from your answer that nowhere in any offset law has there ever been such a payment, but you say the DCA changes that and allows the United States to do that. The United States overpaid Agility United States funds, and it's collecting it through an offset. Okay, now you're just repeating yourself. Well, yes, but that's our argument. Respectfully, Your Honor. Is there that Congress meant the DCA to provide an offset substantive right radically different from any that has ever existed in offset law? I don't think this is radically different, Your Honor. This is money that was paid by a United States officer, United States money. In my roofer example, put aside the DCA, would offset ever be allowed? Your Honor, correct. I don't have to pay my roofer because I gave my money to my neighbor to pay his roofer. And I think the difference between what I'm announcing to you, Your Honor, and your example is that in that scenario, you believe that the United States saying that the money going to be used for this contract or you saying that the money is going to be used for your neighbor transforms that money into Iraqi money or transforms it into your neighbor's money. Our position is that no such transformation occurred, that this remained money that was appropriated to the Department of Defense for use in the reconstruction of Iraq. It was not given to Iraq as a gift, if you will, of here's $1 million, spend it on anything you want. It was controlled by the Army Corps of Engineers in the sense that they were paying it. It was still United States money. Why was the United States paying money on agility's contractual services with Iraq? When the transition from the Coalition Provisional Authority occurred, the defense fund for Iraq, I believe, was running dry, Your Honor. The money to do this contract needed to come from somewhere, and Congress determined that it would come from appropriated funds. So it was helping Iraq meet an obligation that Iraq incurred by contracting with agility for agility to provide a whole lot of services. Right, and I think that the difference between what we're saying is whose money is it? Now, the question of whether the debt itself is valid, and that's really what we're arguing about here, is this debt valid? It's a question that agility has put forth. No, I think the question is, does the debt run to the United States from agility? Agility has a debt on the assumption that there's an $80 million deficit, but what is, I think, undisputed is that it's not a debt to the United States. I apologize, Your Honor, but the contracting officer said that this is a debt to the United States, so this is disputed. The contracting officer can say anything he wants in the letter, but I take it that the legal landscape that we've established here is that the only legal obligation agility had outside the DCA is to Iraq. I'm sorry, the only legal obligation they had to Iraq? With respect to the $80 million. No, the contracting officer determined it was a debt owed to the United States, Your Honor. That's what these documents show. Now, agility disagrees with that. You know, we understand that there was a big gulf between our positions on that, whether or not Mr. Woodstock, the contracting officer, when he issued these final demand letters, was correct. The contracting officer said, well, let me put it this way, ask the question this way. Did the contracting officer said, here is the legal basis for not just that they owe $80 million, but that they owe it to us? The contracting officer said it was owed to us. Outside the DCA, right? Correct. A legal obligation outside the DCA. And what is the basis for that legal obligation? The contracting officer didn't specify a legal obligation beyond the fact that it was overpayment of United States funds. Right. Right, right. So the answer is there is none. It's entirely dependent on the legal obligation running from agility to Iraq. Correct. That's what his role was as contract administrator was to make this sort of determination. He determined the money should be owed to the United States since the United States is the party that paid them. And under the restatement or anywhere else, either restatement of agency, restatement of contracts, does an agent ever get to do that? That question should be answered in the district court. It hasn't been briefed below, Your Honor. The question of whether or not the debt that the contracting officer determined in the 12 final demand letters, whether it's valid or not, that is what the first statement is on the claim for relief in the 2016 district court case. Now, this complaint in the district court is a little bit old because it predates your prior decision in 2008 on this matter. And it's sort of a backup complaint at this point. But at least part of this complaint is challenging the actual validity of the debt, that the contracting officer should never have determined that agility owes almost $81 million to the United States for various reasons. What agility has done is gone in the wrong direction here in its various different complaints. It came to the Court of Federal Claims and once it argues even today that the debt is otherwise illegal without first getting a judicial determination that the debt, the $81 million debt, is actually illegal. If you work under the premise there's been no determination of this debt being illegal, then the Debt Collection Act by its terms shows that there has been a claim because an appropriate official has determined the money was owed to the United States, and that claim is an overpayment. What agility should have done is gone to the district court first, got a determination that the United States should not have been, you know, in their opinion, should not have been issuing final demand letters on a contract in which we were not, they were not privy to, and then the Debt Collection Act would not be applicable because there would be no valid determination by an appropriate official. But they've done it backwards. What they've come in and said, don't use the DCA because we intend to show later that this is an invalid debt. And, Your Honor, I understand your concerns, but I believe your concerns are about whether the debt of the original of the validity of that debt. Let me just be clear. I would assume that $80 million is owed. What I don't see literally the slightest basis for is the idea that it's owed from agility to the United States. Well, then I would say, Your Honor, you don't assume that the debt is owed. The premise of coming into this case, if they haven't challenged the debt to the United States, is that the debt is to the United States as well. I understand your... I'm sorry. I thought the basis for their challenge to the DCA ruling as well as their successful challenge to the common law was that if there's a debt, it's not from us to the United States. It's from us to Iraq if there is one. And what the trial court held was that if you look at the terms of the DCA, if the appropriate official makes the determination, then you can collect under that collection act the plain meaning of that statute, Your Honor. Whether the money is owed to the U.S. or to Iraq, there's been an overpayment. Mm-hmm. There's been an overpayment. Correct, Your Honor.  It's those funds that were being used to pay agility at some point, whether it was through the U.S. or Iraq. Yes. And it's a misuse. When there's an overpayment, then it can be said that those payments were not made for the specific purpose for which they were appropriated. Correct. So one way or the other, whether the debt is owed by Iran or to the United States, there's been an overpayment. Right. And the DCA allows for a claim of an overpayment. By the plain terms of the DCA, correct, Your Honor. Yes. And to be clear about our common law argument, Your Honors, that is a backup argument in the event that the procedures of the DCA were not followed. The common law does allow the collection. That is the HSH Nordbank case that we cite in our briefing. Just to be clear, you're not relying on that thesis to support your DCA claim. No. Your DCA claim is separate. Yes. No, no, no. Language of the statute, the definition of a debt or claim is separate. If you look at the documents that have been appended to the pleadings, Your Honor, and included in the joint appendix, this was a Debt Collection Act collection. Do you have any examples, whether it's case law or there's some reference in the statute to an executive order relating to, you know, the government somehow using this statute to collect payment from parents who are not providing child support. Do you have any examples at all that support your position? You know, any example that we could find of the use of DCA just wasn't comparable to this situation. This is a very, very unique situation. And it's made briefing, I'm sure, for both parties difficult because of what actually occurred back in 2003 with this contract, the letting of it, the different roles of the different governments in this. There was nothing that was an apt comparison, Your Honor. Regarding the request by Agility to have a remand to go through the procedures, what Agility argued below was, in their opinion, procedures weren't followed, so, therefore, the Debt Collection Act was never used. That was their argument below. What they did not do below was give to the trial court an argument as to why the notifications they did receive were insufficient to meet the requirements of the Debt Collection Act. A request now for a remand to go through that process is piecemeal litigation. They didn't cite the relevant statutes. Absolutely. Right? They did, but how am I supposed to? Oh, sorry, please. And then I think in response to that, you provide the letters that we have in the appendix, right? That's correct. And then it was their job to say why those letters are insufficient. They didn't do that. They didn't give the trial court an opportunity to rule in another way. Well, on a summary decision, you don't think that it was enough for them to say, here's the statutory provision, here's the letters. The letters don't satisfy those provisions. Not when our answer is, yes, they do. They need to say, no, they don't. And I can tell you the appendix. Sorry, please. Maybe you could have explained why they satisfied the provisions. I mean, who had the burden to show that they were satisfied? Well, the allegation on their part was that they were not satisfied, and they were very plainly that the documents that they placed into the record and their pleadings were missing these letters. They weren't attached. When we placed them in, we were completing what the pleadings should show. And we can tell you right now, going through 31 U.S.C. 3716 and the different procedures. Show me where number four was met, an opportunity to make a written agreement with the head of an agency to repay the amount of the claim. So that is page – there's two instances of that, Your Honor. The first instance of that is appendix page 1663. And I'm looking through the wrong binder. 1663? Correct, Your Honor. And this is the original debt letter. So to be clear, the requirement that we're talking about here is the opportunity to make a written agreement with the head of the agency to repay the amount of the claim. And there's two things here that I would like to point out. Towards the bottom of 1663, the second to last paragraph, quoting it, if you believe the debt is invalid or the amount is incorrect, please contact the undersigned immediately. So that's telling – let us know if you think this is wrong. The next paragraph is if you are financially unable to pay the full amount of the debt at the present time, you may request an installment plan agreement. So right there is an offer to make a settlement to pay this off slowly as opposed to an offset. The second instance I have written down here, Your Honors, and what I've done just to explain to you is I have 3716 in front of me and I have appendix pages marked next to all of this. Because simply this wasn't briefed below. And these issues weren't really decided, right? They weren't raised. Yeah, I would say they weren't decided because they weren't raised. I don't fault the trial court for that. It's incumbent upon a plaintiff. Is this on the procedural requirements that we're talking about? These are the procedural requirements. I thought Judge Wheeler had a paragraph that actually ruled on it.  Can I – maybe I – Yes, please, Your Honor, I apologize. But isn't the rule about forfeiture that you don't – you get to raise on appeal an argument that was either raised below or ruled on, and this one was ruled on. Well, this was ruled on, yes. So it doesn't really matter whether – Well, I think their argument below was that none of the procedures were followed. And Judge Wheeler sees these documents and agreed the procedures were followed, and they didn't raise arguments why specifically page 1663 doesn't apply, why page 2173 that I'm stating to you now is insufficient. Where is there something addressing the opportunity to inspect and copy records of the agency related to the claim? They were given all the records, Your Honor. So I would say that there is nothing explicitly stating in the documents, I'm going to give you all the records, but the records were given to them. And these are – What about the opportunity for review within the agency of the decision of the agency? Opportunity for review, that is also the 1663, if you disagree with me, language. And also there is an opportunity for a written appeal discussed on 2173. And that is on page – What about a written agreement with the head to repay them? I mean, I know we've asked this already. Right. You've just shown to discuss this or to address it, but where is there notice for the opportunity to enter into a written agreement? The language on 1670 – 1663, excuse me, about installment plan, Your Honor. I assume the installment plan would be written. Okay. And then there's on 2173 in the last paragraph, the second sentence, if after hearing the explanation you believe you do not owe the debt or that you owe an amount other than what is shown on the enclosed bill, you may submit a written appeal to the division chief. If the court has no further questions – Oh, just one comment about that. I think there was a statement while my colleague was going that where does this get you if the procedures weren't followed? It doesn't really get them anywhere, right? They were aware this whole time this offset was occurring. They were aware that they disagreed with it. They chose specific ways to challenge this, first going to the ASBCA and then going to this court in the Debt Collection Act and then holding the district court in reserve. Agility has not been blindsided by anything. Why haven't we seen an argument here about unjust enrichment? Why haven't you raised that? I believe there was an unjust enrichment argument. The other way around. Other way around, below, correct. And it was discussed below that they have this $81 million that does not belong to them, but I think it would also depend on who the debt is owed to, who has been denied the enrichment because they're unjustly enriched. So that's why there hasn't been – If you feel the debt was owed to you, why didn't you make the argument? They would have lost the earlier case. I'm sorry, Your Honor? Why didn't you challenge, as part of your DCA claim, say that the legal justification for it is unjust enrichment? I think that's the claim. Well, the documents do say DCA. That's why we pursued on the DCA, Your Honor. Okay. As a backup argument. Under the common law, why not rely on unjust enrichment? Well, I mean, basically that is what common law offsetting is. You have money that doesn't belong to you. It belongs to us. We take it back. So our backup argument under the common law, while we didn't say unjust enrichment, is the same analysis, if you will. Thank you, Your Honors. Let's – Mr. Schaffer, I'm putting you back at five minutes. Thank you, Your Honor. We appreciate that. Let me just quickly say, Judge Stoll, if it had been unjust enrichment, there would be a fair fight about that. We would be able to address that under the common law just as one would and show, in fact, we weren't unjustly enriched. We were underpaid. And there would be the opportunity, presumably, to offer that showing to Judge Wheeler. We never had that opportunity in that court or any other court. Isn't that argument, though, raise the specter of a contractual right outside of the DCA? But, Your Honor, I think that it is common ground that there is no such contractual right because the United States was not a party to that contract. But you asked the question, weren't these United States funds? That's how you started with Mr. Grimaldi. And I just want to emphasize what you were hearing, what this court was hearing from the United States and from Mr. Grimaldi the last time around because there were questions about whether the United States, through its conduct, through task orders, through innovations of the PCO contract, had assumed party status. And the United States said, basically, that you should not consider these United States monies in terms of the legal characterization because money is fungible, and it was paid on behalf of the Iraqi government. We can see that in the argument transcript that was specifically quoted. So when Mr. Grimaldi says there was no transformation of these funds into Iraqi funds, actually he was submitting exactly the opposite to this court, that for all legal purposes, Judge Toronto, these were Iraqi funds. One way or the other, whether they're paid through the United States or through Iraqi, those funds were supposed to have been paid for the reconstruction efforts. Very specific expenditures. And it makes all the difference, though, Judge Rainey, because then if an Iraqi court were to determine that, in fact, there had been a quote-unquote overpayment, then that could set up some sort of a dispute. It's an essential premise of it. No Iraqi court is so determined. In fact, the United States has conceded that they are claiming this money without input from Iraq, without Iraq contending that there was any sort of an overpayment, and they also concede, Judge Rainey, they explicitly conceded our allegation, I think it's in paragraph 129 of the complaint, and in their answer, they concede they are not repaying these monies to Iraq. This is not part of any internal accounting for Iraq. They're not recovering them on behalf of Iraq, and they have no authorization from Iraq to claim that there was anything that Agility failed to do under the PCO contract or anything that Agility was overpaid. So they have completely changed their position. Their premises and their legal submissions are exactly the opposite of what they successfully convinced the court of last time around. I think that that matters to the correct analysis of whether there's any obligation or any debt that flows from Agility to the United States. I think it's important to that, Judge Toronto. But even if your honors weren't persuaded of that, this is a paradigmatic case for judicial estoppel. And one of the problems that would result from a holding in favor of the United States is that no one denies, Judge Rainey, that Iraq was the principal to the contract, and so if there were overpayments under the contract, it is Iraq's claim, and Agility would have double exposure. Iraq could come after them for these same monies. I'm sorry, Judge. That's all right. I heard you say just a moment ago that they're arguing inconsistently, but what about the finding in the first Agility case? But what about the fact that the first Agility case expressly says that each of the task orders had issued their obligated U.S. funds? There's no question that the United States government, as a contracting agent, was paying monies to Agility. But the key question is what is the correct legal characterization of those monies. Judge Toronto's hypothetical about the roof, I submit, is exactly right. And the correct legal characterization of those monies, when they're paid from one homeowner on behalf of the other homeowner, is it's the homeowner who has the contract with the roofer who's getting the benefit of those monies. And the United States has foreign aid all over the world, but it does not follow from that that because United States monies are paid out to a foreign government and the foreign government is undertaking a contract using those monies, that the United States holds the claim as though it were the contracting party. All law to this point, every decided case and the restatement on which this court relied, establishes that there's no legal claim that the agent has against the contracting counterparty, nor does the agent have liability. Those two things rise or fall together, and this court held last time that the United States does not have liability under this contract. The last thing I want to address is the notion that we've just done it wrong, Your Honors. We went to the wrong court first. The United States has successfully argued up and down all around the country and persuaded this court that when someone files an APA suit, seeking declaratory relief, seeking an injunction, if the bottom line of that is that it implicates money damages that the United States would owe, particularly in connection with the contract, that suit belongs in the Court of Federal Claims coming up to this court. And this court has jealously protected its jurisdiction at the United States' urging. To now have the United States have it the other way and say it's really the dog and not the tail that should be adjudicated through the DDC and an APA action, totally reverses and upends this court's carefully established precedent. We don't think that that makes any sense, especially when you have such claim splitting, inefficiency, and a loss of this court's control over cases like this that involve claims for contractual monies owed by the United States. We thank you for your arguments. We thank all the parties for their arguments today. This court now goes into recess. Thank you, Your Honors.